1998 SD 52

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Paul Dean JENSEN, Defendant and Appellant.**

**People in the Interest of P.D.J., Jr., An Alleged Juvenile Delinquent.**

Nos. 19923, 19926.

Supreme Court of South Dakota.

Argued Oct. 23, 1997.

Decided May 27, 1998.

Rehearing Denied July 6, 1998.

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

Timothy M. Engel and Robert K. Sahr of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellant.

AMUNDSON, Justice.

[¶ 1.] After being transferred to adult court, fourteen-year-old Paul Dean Jensen, Jr., was convicted of murder for the death of Michael Hare, a Pierre, South Dakota, taxi cab driver. Jensen appeals. We affirm.

### FACTS

[¶ 2.] The evidence presented in the transfer hearing and at trial disclosed the following sequence of events. Prior to the night of the murder, Jensen had already established a troubling history of unacceptable behavior. Though only fourteen, his experience in criminal activity already included shoplifting, vandalism, burglary, arson, stalking, and more. His record at school included excessive tardiness and absences, verbal abuse of staff and students, physical abuse of students, intimidation of students and school staff, destruction of school property, and failure to perform required academic activities.

[¶ 3.] The facts leading up to and around the time of the murder are relatively clear. On January 14, 1996, at about midnight, the Pierre taxicab dispatcher received a call requesting a ride from Buhl's Laundry. When the cabdriver arrived, she was met by Jensen and his friend, sixteen-year-old Shawn Springer. Jensen entered the passenger door and slid all the way across to a position directly behind the cabdriver while Springer sat in the front seat. At the request of the passengers, the driver took them to the Steamboat Apartments—a distance of two blocks. Once there, Springer exited the cab and entered the apartments, leaving Jensen in the cab sitting directly behind the driver. Because Jensen's seating location was making the cabdriver uncomfortable, the cabdriver turned around to make conversation with Jensen. However, he was uncommunicative. When Springer returned, he told the cabdriver to take them to a restaurant called the Happy Chef—a distance of two blocks. On the way, Springer asked if anyone had ever stolen or tried to steal the cab money bag. The cabdriver responded that if anyone did try to steal it, they could have it, as it only contained thirty dollars. Finally, the boys exited the cab at the Happy Chef, ending their ride about a block from where they met the cab in the first place. This sequence of events was later pointed to by the prosecution as a kind of "dry run" before the actual robbery and murder that would take place twelve days later.

[¶ 4.] On January 21, 1996, at around 2 p.m., Jensen, his older sister, and Springer entered a friend's apartment with the intention of stealing money which they thought might be there. Jensen and his sister had been in the apartment before and knew from their prior invitations that the door would be unlocked. Once inside the unlocked apartment, the group stole seventy to eighty dollars, a necklace, a handgun and a shotgun. The handgun turned out to be the weapon that would be used to kill the taxicab driver five days later.

[¶ 5.] On January 26, 1996, at approximately 7 p.m., Springer called a friend of Jensen's sister to get permission to come over with his dog, which the friend consented to allow.

Right after this conversation, Jensen came on the phone and secured permission from the friend to borrow a bandanna or handkerchief. Jensen and Springer then departed for the friend's house, arriving between 7:30 and 8:30 p.m.

[¶ 6.] Once there, Jensen went to a back bedroom to get a compact disc. Because it took so long and because recently money had been missing from the house, the friend went to the back bedroom to check on Jensen. The friend then discovered that Jensen was carrying a gun in his pocket. This was the same gun that Jensen had stolen five days earlier.

[¶ 7.] Eventually, Jensen showed the gun to the friend along with two or three ammunition clips. The friend then suggested that Jensen leave the gun in the house for safekeeping and Jensen returned to the bedroom, ostensibly to do so.

[¶ 8.] After a while, the friend, Springer, and Jensen went to a truck stop, approximately three blocks away, to get some things. Although it was bitterly cold, none of the three wore anything over their faces, including Jensen, who had previously asked to borrow the bandanna.

[¶ 9.] Later, back at the house, at approximately 10:45 to 11 p.m., Jensen and Springer prepared to leave. Jensen then prompted the friend to lend him the bandanna that he had asked for earlier on the phone and the friend complied. When they left, both Jensen and Springer were wearing bandannas over their faces. After Jensen and Springer had gone, the friend checked the back bedroom for the handgun, but there was no sign of it.

[¶ 10.] At approximately 10:50 to 11 p.m., the Pierre taxi dispatcher received a call from Springer requesting a ride from the "north back door" of the Days Inn. When told that the taxi would wait at the Days Inn office, Springer insisted on being picked up "in the back." The dispatcher refused, saying the cab would arrive at the office door. The dispatcher then asked how many passengers and Springer said two. The dispatcher then asked where they were going, but was interrupted by a barking dog. After being

asked by the dispatcher again, Springer said, "Paul, where are we going?" Jensen replied, "I don't know. Fort Pierre, I guess. I don't know."

[¶ 11.] When the cabdriver, Michael Hare, arrived at the Days Inn, there were no passengers in sight. A little later, Hare noticed Springer and Jensen coming from the back of the Days Inn. They entered the cab and directed Hare to take them to Fort Pierre.

[¶ 12.] Eventually, Springer and Jensen had directed Hare to take them down a gravel road near Fort Pierre where the cab stopped. At this same time, the dispatcher was trying to call Hare's cellular phone. Hare did not directly respond to her call, but the dispatcher could hear over the cell phone Hare say, "That's all I have is thirty bucks. Take it. Take it all." The dispatcher then heard Springer say, "That ain't all you got." Then, Jensen and Springer could be heard to demand "everything." Hare replied, "That's all I have. They only give us thirty bucks. You can have it. Take it, take it all."

[¶ 13.] Jensen got out of the cab with his gun drawn and ordered Hare to exit the vehicle. Shortly thereafter, Jensen shot Hare in the chest with the handgun Jensen had previously stolen. Hare fell down and yelled, "Please God, don't kill me." Then, Jensen approached Hare and shot him once more on each side of the head, killing him.

[¶ 14.] Jensen then grabbed Hare's billfold and other items, which had been set on the cab's hood, and jumped into the cab's passenger seat. Springer had already sat down in the driver's seat and he proceeded to drive the car farther down the road as soon as Jensen had entered it. Soon after this, they turned around and were headed back to the main road when they met a police car. The officer had been alerted to the robbery by the dispatcher and, on meeting the cab, turned around and gave chase. Springer drove the cab too fast for the wintry conditions and missed the turn onto the main road. The cab came to rest in a snowbank and Springer's efforts at spinning the wheels to get the cab to move were fruitless.

[¶ 15.] Officers were on the scene within seconds. Jensen and Springer departed the cab as the officers approached. When asked questions by the officers at the scene, Jensen was less than truthful in his responses. He denied that there was a gun, but the gun was found in the snow next to the passenger door of the cab. When asked where the taxicab driver was, Jensen said they had dropped him off in town. When searched, Jensen had $36.48 in his pocket.

[¶ 16.] Later, Jensen was transferred to the Juvenile Corrections Center in Rapid City. While there, Jensen bragged to the other juveniles in his holding area that he had killed a taxi driver by shooting him three times, and that the robbery and killing were planned. Jensen related the story of his cold-blooded execution-style murder in a calm and unfeeling manner, as described in the testimony of one of the other juveniles at the center.

[¶ 17.] On January 29, 1996, a motion was filed to transfer Jensen, who was only fourteen at the time he shot Michael Hare, to adult court. After a week-long hearing, the motion was granted. Following a jury trial held from September 23 through October 4, 1996, he was found guilty of first-degree murder, among other charges, and sentenced to life in prison.

[¶ 18.] Jensen appeals, raising the following issues:

1. Whether the transfer to adult court was an abuse of discretion.

2. Whether his due process rights were violated by denying him

the opportunity to present evidence at sentencing.

3. Whether life imprisonment without the possibility of parole

constitutes cruel and unusual punishment because of his age, background and likelihood of rehabilitation in the juvenile system.

4. Whether the defendant was improperly charged with and convicted of multiple counts of homicide.

5. Whether the prosecution improperly stated its personal opinions and vouched for the veracity of its witnesses.

## DECISION

### [¶ 19.] 1. Transfer to Adult Criminal Court

[¶ 20.] Jensen claims the court erred in transferring the proceedings to adult criminal court. While it is well established that "a transfer hearing is a 'critically important' action determining vitally important statutory rights of the juvenile," it is also true that "it is within the discretion of the trial court to determine whether to transfer juvenile proceedings to adult court." *In re A.D.R.*, 499 N.W.2d 906, 907 (S.D.1993) (citations omitted) (alterations omitted); *see also* SDCL 26–11–4. On review, "there must be substantial evidence in the record to support the juvenile court's finding that it would be contrary to the best interests of the child *OR* of the public to retain jurisdiction over the child." *State v. Harris*, 494 N.W.2d 619, 624 (S.D.1993) (citing *In re L.V.A.*, 248 N.W.2d 864, 870 (S.D.1977) (other citations omitted) (emphasis in original)). Jensen claims it was an abuse of discretion for the trial court to transfer his case to adult court. "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by and clearly against, reason and evidence." *State v. Jones*, 521 N.W.2d 662, 673 (S.D. 1994) (citation omitted) (internal quotations omitted).

[¶ 21.] SDCL 26–11–4 provides that, in making the decision whether to transfer a juvenile to adult court, the court shall consider "only whether it is contrary to the best interest of the child and of the public to retain jurisdiction over the child." However, neither the interests of the child nor the interests of the State are controlling considerations. *Harris*, 494 N.W.2d at 624. "Nor, by the plain language of the statute, is the trial court required to consider both of these interests at the transfer hearing." *Id.* (citing SDCL 26–11–4; *L.V.A.*, 248 N.W.2d at 870).

[¶ 22.] The statute also sets out the following factors to aid in the determination of whether to transfer the proceedings:

(1) The seriousness of the alleged felony offense to the community and whether protection of the community requires waiver;

(2) Whether the alleged felony offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the alleged felony offense was against persons or property with greater weight being given to offenses against persons;

(4) The prosecutive merit of the complaint. The state is not required to establish probable cause to show prosecutive merit;

(5) The desirability of trial and disposition of the entire felony offense in one proceeding if the child's associates in the alleged felony offense are adults;

(6) The record and previous history of the juvenile;

(7) The prospect for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile, if the juvenile is found to have committed the alleged felony offense, by the use of procedures, services, and facilities currently available to the juvenile court.

SDCL 26–11–4. Although these factors can be looked to for guidance, they do not

> reduce the discretion of the trial judge in transfer hearings, nor was it the intention to create a rigid or cumbersome procedure to be followed by the trial courts in all cases. It is not necessary that evidence be presented on all of these factors at each transfer hearing, or that the trial court ... make express findings on each factor.... A court is not required to consider every one of the listed factors nor is it confined to a consideration of only the listed factors to the exclusion of others. No controlling weight is given to any factor. The court's findings of fact upon which its order is based shall not be set aside upon review unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

*Harris*, 494 N.W.2d at 624 (citations omitted) (internal quotation omitted).

[¶ 23.] Jensen first asserts that there is no evidence in the record to indicate that it would be contrary to his best interest for the juvenile court to retain jurisdiction. Even assuming that the record lacks such evi-

dence, that is not the only consideration. While Jensen's best interests, as he sees them, may not have been served by the transfer, the interest of the public also governs. *See* SDCL 26–11–4 (stating trial court can consider "the best interest of the child and of the public").

[¶ 24.] After an exhaustive five-day transfer hearing, the lower court entered seventeen pages of findings of fact and conclusions of law. Although a court is not required to consider each of the seven factors in SDCL 26–11–4 before making a decision, *In re A.D.R.*, 499 N.W.2d at 908, the lower court's findings addressed all of them in determining whether Jensen should be transferred out of juvenile court.

[¶ 25.] *a. The Seriousness of the Alleged Offense/Protection of the Public*

[¶ 26.] Among the many charges brought against Jensen was the most serious offense possible—first-degree murder. The lower court noted in its findings that there was substantial evidence to support the charge. Indeed, Jensen readily admitted to several people that he killed Michael Hare. Thus, a legitimate concern for the safety of the public arose based on the fact that there was substantial evidence that Jensen had admitted to the shooting of a defenseless, pleading victim.

[¶ 27.] *b. Manner of Committing the Offense*

[¶ 28.] The lower court noted in its findings the substantial evidence of Jensen's premeditation, unfeeling coldness, and willingness to act violently in carrying out the robbery and murder. Facts that the lower court noted that supported a finding of premeditation included: Jensen stole the gun in advance; Jensen obtained a bandanna in advance of the incident to disguise himself during the robbery; Jensen and Springer "cased" taxicab operations by taking the short taxicab ride less than two weeks prior to the murder; Jensen and Springer tried to call the cab to the back of the Days Inn where it would be dark and secluded; Jensen and Springer intentionally took the gun on the cab ride for the robbery attempt and, according to the testimony of Dr. Ertz who examined Jensen, planned to kill the driver beforehand.

[¶ 29.] As to the violent and willful nature of the offense, the lower court relied on evidence that Jensen admitted to another juvenile that this was a premeditated armed robbery, that Jensen shot the decedent in the chest and head, and that Jensen kept shooting because the decedent "kept moving." The autopsy showed that the decedent was shot at least one time in the stomach and two more times in the head. Even further, the evidence that the lower court relied on showed that the decedent offered no resistance and gave up all the money Jensen would have expected to be there; the decedent was shot despite pleas for mercy and despite turning over all the money he had; and Jensen told one of the doctors who examined him that he shot the cabdriver because the driver had seen Jensen's face.

[¶ 30.] Jensen contends that he was acting under the control of Springer or out of a sense of fear and confusion. However, the lower court rejected these notions based on all the evidence, including the evidence of extensive planning, Jensen's opportunity to avoid the robbery, and the manner of the killing.

[¶ 31.] *c. Whether Alleged Offense Was Against Persons or Property*

[¶ 32.] The alleged offenses relating to the robbery and murder are offenses against the person. Thus, this factor weighs more heavily in favor of transfer than if this case only involved an offense against property, as the lower court properly concluded. *See* SDCL 26–11–4 (stating more weight is given to offense against persons).

[¶ 33.] *d. Prosecutive Merit*

[¶ 34.] Obviously, the prosecutive merit of this case was extremely high, and the lower court properly found as much, considering that Jensen has admitted to others his participation in the murder and was caught red-handed at the scene.

[¶ 35.] *e. Desirability of Trial and Disposition of Offenses in One Proceeding*

[¶ 36.] This factor is inapplicable because the State chose to try Jensen's case separate from Springer's.

[¶ 37.] *f. Record and Previous History of Jensen*

[¶ 38.] The lower court's findings on this issue give a picture of the sad and troubled history of Jensen. Jensen's conduct in school took a turn for the worse in sixth grade, starting with his absenteeism and tardiness, as well as choosing not to do his school work. This improper conduct progressed to verbal and physical abuse of school staff and students. Students, teachers and aides became intimidated by Jensen.

[¶ 39.] Jensen was held back in the sixth grade for another year and the problems continued. Jensen intimidated students and school staff to the extent that many teachers and staff even feared him and kept their distance. The lower court noted that one sixth-grade teacher is still intimidated by Jensen and appeared very reluctant to testify against Jensen at the transfer hearing. The list of individuals who expressly indicated fear of Jensen included: Mary Crawford, Jensen's sixth-grade teacher; Dan Cronin, Jensen's sixth-grade principal; Sue LaRouch, an aide at Jefferson School; Kay Huxford, Jensen's other sixth-grade teacher; and Jefferson School secretaries.

[¶ 40.] The lower court also found it significant that extensive attempts were made to discipline and rehabilitate Jensen in the sixth grade at Buchanan School. Jensen's school principal there spent more time trying to help Jensen than any other student the principal has ever had. Attempts by a personal family counselor and a school counselor were unsuccessful in changing Jensen's behavior.

[¶ 41.] School officials again tried to help Jensen when he transferred to Jefferson School for his second year in the sixth grade. A special education referral was made that included a psychological evaluation by Lee Pfeiffer, an educational evaluation and a language evaluation. Echoing the efforts of the Buchanan school staff, more was done for Jensen to help him at Jefferson School than for any of the other children. The consensus of these many school officials and staff who attempted to assist Jensen was that he had the ability to achieve and behave, but made a conscious decision not to do his work or properly conform his conduct. The results of testing done on Jensen also bore these facts out.

[¶ 42.] One of the defense tactics was to portray Jensen as an emotionally disturbed youth who was failed by the system. For instance, Jensen was alleged to have been teased and tormented by his peers for being fat. However, the lower court's findings based on the testimony of many witnesses concluded that no school staff observed anything of the sort. Jensen, himself, had also denied being teased when asked about it by the Jefferson School Counselor, the Buchanan School Principal, and Mr. Ling, Jensen's personal counselor.

[¶ 43.] As to emotional problems, Mr. Ling worked with Jensen's entire family for a lengthy period of time and ruled out a mood disorder as a diagnosis for Jensen. Instead, Mr. Ling found that Jensen had an oppositional defiance disorder. Mr. Ling testified that the oppositional defiance disorder meant that Jensen had difficulties following social rules and norms, was easily angered and frustrated, and had a short temper. Moreover, when Jensen was taken to the Human Services Center for psychiatric treatment, Dr. Soundy did not diagnose depression. At the most, Dr. Soundy decided depression was a "rule out" matter. Although Lee Pfeiffer noted some depression, she did not diagnose Jensen as a "severely emotionally disturbed child." As opposed to the defense portrayal of Jensen as having severe emotional problems that ruled his actions, numerous school observations and tests indicated that Jensen's behavior was a matter of choice. The lower court's findings concluded that Jensen was intellectually capable of performing his school work, but consciously determined to act in defiance of authority.

[¶ 44.] Turning to Jensen's criminal history, the findings noted Jensen had twenty-nine contacts with law enforcement officials including the following: curfew violation,

shoplifting, truancy, vandalism, burglary, fireworks violations, rock throwing, arson in school, stalking two eight-year-old girls, and burglary of laundromat machines. This does not include the burglary in which Jensen stole the gun that later would be used as the murder weapon.

[¶ 45.] The findings also reflect Jensen's ideation with gangs. While not a member of an actual gang, Jensen has acted in manners imitating gang behavior and has also admitted that he is a gang "wannabe." Jensen has used street slang used by gang members and has told people that he was a member of the Lynch Mob gang.

[¶ 46.] *g. Prospects for Adequate Protection of the Public and Likelihood of Reasonable Rehabilitation Utilizing Procedures, Services and Facilities Currently Available to Juvenile Court*

[¶ 47.] The findings of the lower court took note of the testimony of experts from the fields of corrections, juvenile justice, psychology, psychiatry and education, concerning Jensen's prospects for rehabilitation and the adequate protection of the public. The defense relied on the opinion of Lynne Delano, former Secretary of Corrections for the State of South Dakota, to the effect that there is a reasonable likelihood of rehabilitation in the juvenile system for Jensen, facilities are available to protect the public, and that adult facilities would not provide rehabilitation nor safety for Jensen. Dr. Cynthia Struckman–Johnson testified that Jensen would be in danger of sexual abuse in the South Dakota prison system.

[¶ 48.] The lower court was persuaded by contrary experts because of the shaky foundation on which the defense experts' opinions rested. In this regard, the findings listed the following as nonexclusive examples:

A. Plankinton is the most secure existing facility available within the State of South Dakota. The average stay at that program is from eight to eleven months; however, Ms. Delano admitted that that program is not adequate for [Jensen] and that Plankinton would have to develop some new, undefined program, not presently in existence, to hold Jensen until he was released at 21 years of age.

B. Plankinton is not a lock-secure facility. It is only a staff-secure facility and delinquents can easily walk away.

C. Ms. Delano believed that the State "could" access more secure out-of-state facilities, but she did not identify any specific facility or program that would be appropriate for [Jensen] in this case.

D. Ms. Delano's opinion is based on her belief that this homicide was not premeditated; an opinion which is not supported by this record.

E. Warden Class countered Ms. Delano's and Dr. Struckman Johnson's opinions that the Department of Corrections does not have adequate facilities to safely house [Jensen] in adult facilities. Warden Class testified that they have many minors aged 15, 16 and 17 and could safely accommodate a 14 year old.

[¶ 49.] The lower court chose to rely on the testimony of Cory Nelson, Chief Court Services Officer for the Sixth Judicial Circuit at the time of the transfer hearing. Nelson had first-hand knowledge of Jensen and of available programs. His belief was that the South Dakota Juvenile Justice System could not provide for rehabilitation of Jensen and protection of the public. Nelson's opinion rested on the lack of secure facilities, Jensen's significant history of juvenile offenses, and the inability of the juvenile justice system to hold Jensen after the age of twenty-one.

[¶ 50.] The lower court found the testimony of Kevin McLain, the Director of the South Dakota Juvenile Corrections System, persuasive. Although McLain had testified that another juvenile alleged to have committed a homicide should not be transferred to adult court, McLain testified that the juvenile justice system was incapable of providing for the public safety and rehabilitation of Jensen. McLain's opinion was based upon the severity and manner of Jensen's offense, the purposeful and calculating manner in which Jensen's misbehavior occurred, the ongoing and increasingly severe problems Jensen has had in his home and community despite prior efforts of juvenile programs and services, the

limited duration of currently available programs, and the inadequacy of current programs at Plankinton, among other reasons.

[¶ 51.] The lower court made findings based on conflicting expert psychiatric and psychological testimony. The defense presented the testimony of Dr. Ertz, Dr. Manlove and Dr. Brendtro to the effect that Jensen could be rehabilitated. However, Dr. Franks testified that the prognosis for rehabilitation was poor. The experts did agree as to the diagnosis of Jensen having a conduct disorder and that some level of depression had been present. Nevertheless, the opinions differed as to the level of Jensen's depression, its onset, and its absence or presence at the time of the shooting. The court ultimately concluded that Dr. Franks' opinion on these matters of depression more accurately reflected Jensen's history.

[¶ 52.] Jensen argues that it was error for the court to adopt Dr. Franks' opinion and to discount the testimony of Drs. Ertz, Manlove, and Brendtro.

[¶ 53.] The court explained its reasoning for refusing to adopt the testimony of the defense's psychiatric and psychological experts in the following findings:

A. Dr. Ertz did not testify as to [Jensen's] prognosis, but did testify that this was not a "situational crime." This testimony is important as all the experts agreed that juveniles involved in situational crimes are more treatable.

B. Much of Dr. Ertz's and Dr. Manlove's opinions are based on the history given to Dr. Ertz by [Jensen] while in detention. Some of that history is not supported by the factual evidence from the observers of the facts at the time the events occurred. Dr. Franks' opinion is more closely based on the history of [Jensen's] earlier adolescent history that this Court finds more probable in significant areas such as:

1. The amount of teasing [Jensen] received at school.

2. The level and degree of prior depression as noted by various professionals including Dr. Soundy and Mr. Ling.

3. The nature of the real relationship between [Springer] and [Jensen].

4. [Jensen's] level of remorse after the shooting.

C. Dr. Ertz also admitted that [Jensen] lied or minimized unfavorable facts to him in his history. One such example is [Jensen's] description of the 'dry run' which shows premeditation.

D. Because of the tendency of [Jensen] to minimize or lie, Dr. Manlove's testimony must be discounted in light of his repeated testimony that his belief as to the relationship between [Springer] and [Jensen] was 'according to Paul.' (The nature of this relationship was important to all experts). This Court also declines to adopt Dr. Manlove's opinion because the level of depression Paul was experiencing on the day of the incident is crucial to the foundation of the opinion of all experts concerning the likelihood of rehabilitation. Dr. Manlove, however, only testified that he had a 'sense' that [Jensen] was depressed but could not say in a conclusive way whether he was depressed on the day of the incident or not. Furthermore, the *prior* depressive diagnosis necessary for [Jensen's] experts' opinions was not diagnosed by Dr. Soundy when [Jensen] was in psychiatric treatment at the Human Services Center. Depression was only a 'rule out' possibility upon admission. Although this Court acknowledges the treatment certainly helped any existing depression during the Human Services Center stay, it is still significant that neither Dr. Soundy or Counselor Ling diagnosed it prior to [Jensen's] current legal difficulties. (Emphasis in original.)

E. Many of these deficiencies are also present in Dr. Ertz's testimony. Dr. Ertz conceded that [Jensen's] alleged depression was self reported. Dr. Ertz also limited the other witnesses he interviewed on these issues to [Jensen's] mother and [Jensen's] sister.

F. Dr. Brendtro's psychoeducational assessment is subject to many of the same deficiencies. Upon hearing all the evidence, this Court finds that Dr. Brend-

tro's view of some of the significant events in this case are not supported by the evidence. Some, but not all of the reasons this Court declines to adopt Dr. Brendtro's opinions are:

1. Dr. Brendtro's opinions and versions of many of the significant events are based primarily upon [Jensen's], [Jensen's] mother's or [Jensen's] sister's version of the events.

2. Dr. Brendtro erroneously minimizes the importance of the January 14, 1996 'dry run' incident which the Court finds significant.

3. Dr. Brendtro's version of the gun burglary assumes [Jensen] 'accidentally' found the handgun. There is, however, evidence in this record that [Jensen] and [Springer] were looking for guns.

4. Dr. Brendtro believed that the murder was [Springer's] plan, not [Jensen's]. However, Dr. Ertz testified that [Jensen] admitted that [Springer] and [Jensen] planned the event.

5. Dr. Brendtro's ultimate findings concerning the manner in which the shooting occurred do not have factual merit. The evidence reflects the decedent was shot in the head twice after being shot in the stomach. The method of shooting shows more callousness and dangerousness than the version of events described to Dr. Brendtro by [Jensen].

6. Dr. Brendtro's opinion is based on his belief that 'Paul is not a dangerous person.' However, in light of his prior juvenile history and the way in which this homicide occurred, [Jensen] presents a danger to the community. He has been diagnosed by all mental health experts as having a conduct disorder and has demonstrated a willingness to engage in the most serious criminal conduct to please others.

7. Dr. Brendtro opined that there was not 'any risk' that this could happen again because he believed this homicide occurred as the result of the coming together of the 'most unlikely of circumstances.' This Court disagrees. The evidence reflects [Jensen's] personality and diagnosis tend to make him depend on others. Dr. Brendtro's own report describes [Jensen] as a 'friendless individual willing to do almost anything to please someone who promises a relationship.' Based on this personality and a history of ability to kill at age 14, there is likelihood that [Jensen] may reoffend in the future.

8. In spite of Dr. Brendtro's warning to [Jensen] to be truthful, [Jensen] was deceptive to Dr. Brendtro in areas which would cast an unfavorable light on [Jensen]. For instance, [Jensen] related to Dr. Brendtro that [Springer] wanted the bandanna to cover his face because it was 'cold' when there is substantial evidence that the bandannas were taken as disguises for the robbery. Other errors involved the extent of [Jensen's] knowledge of his imminent move to Iowa, the amount of alcohol [Jensen] consumed on the night of the incident and whether [Jensen] had time to think this matter through before the robbery.

9. Dr. Brendtro's description of a lonely boy without friends is refuted by [Jensen's] own description to Dr. Ertz of having '7 close peers' in Pierre and '14 friends' in Marshall.

10. As another example of minimizing, Dr. Brendtro believed that alcohol was involved in the Van Zee robbery while [Jensen] denied the use of alcohol in that event when describing it to Dr. Ertz.

Thus, the lower court chose to adopt the testimony of Dr. Franks to the effect that the unlikelihood of rehabilitation by age twenty-one and the protection of the public required a transfer to adult court.

[¶ 54.] The court chose not to adopt the testimony of Drs. Ertz, Manlove, and Brendtro. Of course, the mere fact that an expert testifies does not mean that his or her opinion must be accepted by the trial court. A trial court, when also sitting as the fact finder, is the sole judge of the credibility of the witnesses and can accept or reject all or part of the expert's testimony. *Lewton v. McCauley*, 460 N.W.2d 728, 732 (S.D.1990) (citing *Nicolaus v. Deming*, 81 S.D. 626, 139 N.W.2d 875 (1966)). The lower court thoroughly evaluated the experts' opinions and

foundations for each opinion. Based on the record, we cannot find that the trial court erred in adopting Dr. Franks' testimony.

[¶ 55.] Furthermore, we agree that the record demonstrates the futility of rehabilitation attempts in the past with regard to Jensen for minor behavioral problems, and, at the same time, the ever-increasing seriousness of his offenses and misbehavior. On the whole, there is substantial evidence to support the lower court's determination that a transfer to adult criminal court is required in this case.

[¶ 56.] **2. Due Process Rights at Sentencing**

[¶ 57.] Jensen next argues that his due process rights were violated when the trial court denied him the opportunity to present evidence at sentencing. This evidence would have come via the testimony of two expert witnesses that a fifteen-year-old is in greater physical and emotional danger in adult prison than are older inmates. Jensen relies on *Wabasha v. Leapley*, 492 N.W.2d 610 (S.D.1992), for the proposition that his rights were violated because, in the words of Jensen, "a defendant has a due process right to contest or correct factual information relied upon by the sentencing court."

[¶ 58.] Jensen's argument is plainly without merit. *Wabasha* actually holds that "[d]ue process requires a defendant who contests the accuracy of *factual* information relied upon by a sentencing court be given an opportunity to rebut or explain that information." *Id.* at 612 (emphasis added) (citation omitted). In Jensen's case, however, the proffered testimony was *not* to contest factual information relied on by the sentencing court. Jensen's experts would have testified as to a legal issue—essentially whether a life sentence is cruel and unusual punishment in the case of a minor. As such, Jensen presents an unfounded argument.

[¶ 59.] **3. Life Imprisonment Without Possibility of Parole as Cruel and Unusual Punishment**

[¶ 60.] Reviewing a sentence punishing a minor as an adult is obviously one of the most difficult issues a court is asked to

deal with. One court, in grappling with the review of a life sentence for a minor, described the troublesome exercise that it entails:

> What means cruel and unusual punishment is not spelled out in either state or federal constitutions. Recently the United States Supreme Court in *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 2691, 101 L.Ed.2d 702 (1988), noted that
>
> > [t]he authors of the Eighth Amendment drafted a categorical prohibition against the infliction of cruel and unusual punishments, but they made no attempt to define the contours of that category. They delegated that task to future generations of judges who have been guided by the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion) (Warren, CJ).
>
> Former United States Supreme Court Justice Frank Murphy, in an unpublished draft, put the matter very well:
>
> > More than any other provision in the Constitution the prohibition of cruel and unusual punishment depends largely, if not entirely, upon the humanitarian instincts of the judiciary. We have nothing to guide us in defining what is cruel and unusual apart from our consciences. A punishment which is considered fair today may be considered cruel tomorrow. And so we are not dealing here with a set of absolutes. Our decision must necessarily spring from the mosaic of our beliefs, our backgrounds and the degree of our faith in the dignity of the human personality.

*Naovarath v. State*, 105 Nev. 525, 779 P.2d 944, 947 (1989) (citation omitted). "What constitutes cruel and unusual punishment for a child presents an especially difficult question." *Id.* The case at hand is no exception.

[¶ 61.] Recently this Court altered its approach to examination of sentences that purportedly violate the Eighth Amendment prohibition against cruel and unusual punishment. *State v. Bonner*, 1998 SD 30, ¶ 13, 577 N.W.2d 575. No longer will the "shock the

conscience" test be applicable to federal constitutional analysis under the Eighth Amendment. *Id.* Instead, proportionality review will be guided by "common principles" identified by Justice Kennedy in the Supreme Court's latest pronouncement on this issue. *Id.*, ¶¶ 15–16 (referring to *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (modifying *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)). These principles are as follows:

> (1) reviewing courts must grant substantial deference to the legislature's broad authority to determine the types and limits of punishment; (2) the Eighth Amendment does not mandate adoption of any one penological theory; (3) marked divergences "are the inevitable, often beneficial result of the federal structure"; and (4) proportionality review by federal courts should be informed by objective factors.

*State v. Gehrke*, 491 N.W.2d 421, 423 n. 2 (S.D.1992) (citing *Harmelin*, 501 U.S. at 998–1001, 111 S.Ct. at 2703–04, 115 L.Ed.2d at 867–68). In summarizing this new approach, the *Bonner* opinion set forth the following steps:

> [T]o assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends. If, on the other hand, the sentence appears grossly disproportionate, we may, in addition to examining the other *Solem* factors, conduct an intra- and inter-jurisdictional analysis to aid our comparison or remand to the circuit court to conduct such comparison before resentencing. We may also consider

other relevant factors, such as the effect upon society of this type of offense.

*Bonner*, 1998 SD 30, ¶ 17, 577 N.W.2d at 580.

▮▮ [¶ 62.] Our legislature determined that first-degree murder, as a Class A felony under SDCL 22–16–12, should be punished by either a life sentence without parole or the death penalty. SDCL 22–6–1(1). Jensen was sentenced to life in prison according to the dictates of state law and we give extreme deference to sentences within the statutory maximum.[1] *State v. Kaiser*, 526 N.W.2d 722, 726 (S.D.1995).

[¶ 63.] The evidence in the record shows that Jensen shot the victim once in the chest, listened to the victim plead for his life on his knees, and then proceeded to shoot the man two more times in the head. A more senseless act of violence by one human being against another is hard to imagine. The victim had not prompted Jensen's actions in any way and readily parted with the money in the hope that Jensen would spare his life. The evidence also supports the view that the murder was committed in a most calculating and cold manner without any ameliorating circumstances and with extensive planning and preparation. There is little evidence in the record to support the view that Jensen is in any way remorseful, nor was there evidence Jensen's conscience was bothered by his actions. In furtherance of our view, we note the following words of the trial court:

> In pronouncing this sentence, the Court notes that I have considered more information about you, Mr. Jensen, than I probably have in any other criminal case that I have ever tried or sentenced someone.

[¶ 64.] "[C]omparing the sentence with the criminal acts defendant committed and the consequences of those acts upon the victims and society[,]" we conclude that Jensen's life sentence for murder was not grossly out of proportion to the severity of the crime, was within the statutory mandate, and was not

---

1. Jensen argues that the public would be shocked to learn that he "must now spend the rest of his life in prison without any chance of freedom." However, the public, acting through its elected representatives has decided that first- degree murder mandates the sentence that Jensen received. Moreover, the characterization of his plight as "without any chance of freedom" is not entirely accurate. There is always the chance the legislature will pass new laws that will lessen Jensen's term in prison. The governor also has the power to commute a life sentence to a lesser sentence that includes the possibility of parole. South Dakota Constitution, Article IV, § 3; SDCL 24–15–4, 24–14–1, and 24–14–5.

cruel and unusual punishment under these facts. *Bonner*, 1998 SD 30, ¶ 22, 577 N.W.2d at 581. As such, we need not go further and conduct an inter- or intra-jurisdictional analysis.[2] *Id.*, ¶ 17.

**[¶ 65.] 4. Conviction and Sentencing**

[¶ 66.] Jensen was indicted on three counts of murder pursuant to SDCL 22-16-4. The defense took the position that the State's murder counts had to be pled in the alternative pursuant to *Wilcox v. Leapley*, 488 N.W.2d 654 (S.D.1992). The prosecution asserted that mandatory alternative counts would be unfair to the prosecution. This is because, assuming Jensen's murder conviction was reversed on appeal, the State would be precluded from retrying Jensen on the "alternative" murder counts because the court would have mandated "not guilty" verdicts on these charges.

[¶ 67.] The trial court decided that the prosecution would not be required to plead the three murder counts in the alternative. However, in the event of a guilty verdict, the court would only issue one judgment of conviction for murder and would only impose one sentence. This is exactly what occurred.

[¶ 68.] This case differs from *Wilcox*, in that *Wilcox* involved a conviction for both murder and manslaughter arising out of one death. By contrast, the trial court in this case found Jensen guilty of only one count of murder. *State v. White*, 1996 SD 67, 549 N.W.2d 676, is also distinguishable from the case at hand, because *White* involved the conviction *and* sentencing for multiple counts of murder for a single death. *Id.*, ¶ 27, 549 N.W.2d at 682. The trial court properly sentenced Jensen on only one count of murder. Any error that resulted in this case was harmless, because Jensen received only one murder sentence and there is no evidence the multiple charges have had any effect on the result of this case. *See* SDCL 23A-44-14.

[¶ 69.] We have considered the remaining arguments for reversal and find them to be without merit.

[¶ 70.] Affirmed.

[¶ 71.] MILLER, C.J., and SABERS, KONENKAMP, and GILBERTSON, JJ., concur.

**2.** Although not necessary to this opinion, we note the following like-minded decisions by other courts. *See State v. Pilcher*, 655 So.2d 636, 644 (La.Ct.App.1995) (holding life sentence without possibility of parole for 15–year–old murderer was not unconstitutional under the Eighth Amendment); *Swinford v. State*, 653 So.2d 912, 918 (Miss.1995) (upholding trial court's sentence of life imprisonment for 14–year–old who aided and abetted murder); *State v. Garcia*, 561 N.W.2d 599, 611 (N.D.1997) (holding a life sentence without possibility of parole for a 16–year–old did not violate Eighth Amendment) *cert. denied,* —— U.S. ——, 118 S.Ct. 193, 139 L.Ed.2d 131; *State v. Massey*, 60 Wash.App. 131, 803 P.2d 340, 348 (1990) (finding no cause to create a distinction between 13–year– old juvenile and an adult who are sentenced to life imprisonment without parole for first degree aggravated murder) *review denied State v. Massey*, 115 Wash.2d 1021, 802 P.2d 126 (1990) and *cert. denied by Massey v. Washington*, 499 U.S. 960, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991); *see also Stanford v. Kentucky*, 492 U.S. 361, 373, 109 S.Ct. 2969, 2977, 106 L.Ed.2d 306 (1989) (upholding death penalty for person who was 16 years old at the time he committed murder); *State v. Foley*, 456 So.2d 979, 984 (La.1984) (affirming life sentence without parole of 15–year–old convicted of rape against assertion it was cruel and unusual punishment); *White v. State*, 374 So.2d 843, 847 (Miss.1979) (upholding a 16–year–old's sentence of life imprisonment without parole for armed robbery against assertion that it was cruel and unusual punishment); *but see Naovarath v. State*, 105 Nev. 525, 779 P.2d 944 (1989) (concluding that "as 'just deserts' for killing his sexual assailant, life without possibility of parole is excessive punishment for this 13–year–old boy").