2002 SD 47

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Robert Angelo HORSE, Defendant and Appellant.**

No. 21558.

Supreme Court of South Dakota.

Argued Nov. 15, 2001.

Decided April 24, 2002.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellant.

Timothy J. Rensch, Rapid City, South Dakota, Attorney for defendant and appellee.

KONENKAMP, Justice.

[¶1.] This case presents the question whether law enforcement officers can obtain a juvenile's waiver of *Miranda* rights while in custody and proceed with interrogation without notice to the juvenile's parents or guardian. Here, in an investigation for kidnapping and murder, police interrogated a fifteen-year-old without any effort to notify his parents. South Dakota law mandates that law enforcement officers immediately notify a juvenile's parents, guardian, or custodian when a child is taken into custody, and we determine that a child's waiver of Fifth Amendment rights obtained in custody without prior notice to the parents, guardian, or custodian is a significant factor in weighing the admissibility and voluntariness of the child's confession. Under the specific circumstances of this case, we reverse and remand.

A.

Background

[¶2.] Defendant Robert Angelo Horse was fifteen years old at the time of the incidents recounted here. In May, 1999, defendant left his aunt's home in Evergreen, South Dakota, on the Pine Ridge Reservation, and traveled to Rapid City, where he took up residence with his half-brother, Jerry Horse, then twenty-seven years old. Defendant apparently hoped to find work, but was unsuccessful. Instead, he began consorting with one Chaske White, age twenty-five, leader of a gang called the "Real Thug Family," of which Jerry, too, was a member. In this company, defendant began drinking alcohol and smoking marijuana. Eventually, he became a member of the gang by having the letters RTF branded on his chest with a hot knife.

[¶3.] In the early evening of June 15, 1999, a small group including Jerry, Chaske White, and Dawn Frazier (White's girlfriend) picked up defendant at Jerry's home, drove to Kelton Feichert's house and drank beer into the night. Then, Jerry, Chaske, Dawn, and defendant drove to DD's Bar in Rapid City, arriving there about 2:00 a.m. Jerry and Dawn entered the bar, where Jerry met Morning Star Standing Bear (who was an alcoholic and had already been drinking heavily that night), and he invited her to join his group to drive around and drink more beer. Morning Star needed a ride and agreed to go.

[¶4.] Meanwhile, in the bar's parking lot, Chaske met Marty, another acquaintance, and all six drove back to Kelton's home, Chaske riding with Marty, and the others riding with Dawn. At Kelton's, Chaske and Marty began fighting. Chaske beat Marty with a fireplace poker;

defendant joined in on Chaske's side, but Jerry, Dawn, and Kelton broke up the fight. Thereafter, Dawn drove Jerry back to his house, with Chaske, defendant, and Morning Star as passengers. Upon reaching his home, Jerry asked defendant to come in with him, but defendant decided to stay with the group and continue drinking for another hour, when he said he would return. As Dawn drove around the city, defendant and Morning Star engaged in apparently consensual foreplay in the back seat. Throughout the drive, Chaske asked defendant repeatedly whether defendant was "down," meaning, roughly, whether defendant was ready to undertake a planned, concerted action of the gang. Whatever was about to happen was apparently an initiation for defendant.

[¶ 5.] Eventually, Dawn drove the car out into the country. By then, Morning Star had fallen asleep. Dawn stopped the car in a deserted spot, she and Chaske got out, and Chaske ordered defendant to help him pull Morning Star out of the car and then to hit her. By then, all three were in agreement that Morning Star was to be beaten up. Defendant obeyed Chaske's directive, helped him pull her out of the car, and then knocked her to the ground. Defendant then began kicking her and did not stop until he hurt his foot. Meanwhile, Chaske was bending over her, pummeling her with his fists, and Dawn joined in as well, while Morning Star cried out for mercy. At some point, Chaske picked up Morning Star and threw her onto the car and invited defendant to assault her sexually. Defendant refused. Then, Dawn opened the trunk of the car and removed a scissor jack. Defendant took the jack and threw it at Morning Star; Dawn picked it up and did likewise. Then Chaske took over and began beating Morning Star with the jack. One blow pierced Morning Star's skull, entering her brain and inflicting a potentially fatal injury. She was also beaten with a lug wrench and tire iron that Dawn removed from the trunk.

[¶ 6.] Not satisfied with this, Chaske took a bottle that Dawn had broken and stabbed Morning Star repeatedly. Then Chaske ordered defendant to cut Morning Star, and defendant stabbed her twice in the buttocks. Finally, Chaske took the broken bottle and slashed Morning Star's throat, and he and defendant together dragged her body into a nearby ditch. She was still alive at the time, for defendant heard her making gurgling noises and saw her moving her hand. From beginning to end, the assault lasted some twenty minutes. Thereafter, the three cleaned up the crime scene, put the tools back in the trunk, drove back to Chaske's home, cleaned themselves up, and then stayed at Chaske's for the next day and a half.

[¶ 7.] As the investigation closed in on the gang members, law enforcement officers asked defendant to come in for questioning. He voluntarily appeared at the Department of Criminal Investigation [DCI] office in Rapid City. Questioning of defendant began at 8:00 p.m. on June 17. The first session lasted more than four hours. Agent Pat West asked defendant's brother, Jerry, for the telephone number of defendant's parents. Jerry replied that they resided on the Pine Ridge Indian Reservation and did not have a telephone. Accordingly, Agent West sought and received Jerry's permission to question defendant. Jerry was still a possible suspect himself at that point. No officer attempted to reach either of defendant's parents or his aunt, at whose home he had most recently been staying before coming to Rapid City. No effort was made to contact tribal authorities on the reservation for help in contacting defendant's parents. During the first session, defendant asked to speak to his half-brother Jerry, but an officer responded, "You're not going to

talk to him right now." The first session ended about 12:30 a.m. on June 18.

[¶ 8.] The second questioning session began after a half-hour break. At about 1:00 a.m., Agent West and Investigator Bramblee took defendant, handcuffed, to the crime scene in Agent West's car. During the trip to and from the scene and at the scene itself, the questioning continued. At some point after return to the station at about 3:00 a.m., Agent West placed defendant under arrest and took him to the Juvenile Services Center [JSC]. The third session began on the next day, Saturday, June 19, at 8:30 a.m., at the JSC. Agent West questioned defendant primarily with a view to clearing up discrepancies among the accounts of Chaske, Dawn, and defendant. It is not necessary here to recount the unfolding of defendant's gradual admissions. After initially denying any involvement in the crime, defendant eventually told investigators of his participation.

[¶ 9.] In the course of the interrogations, officers represented that they could not make any promises, but they also said that they were providing defendant with a "lifeline," that they would "go to bat for" him, and that it was unlikely that he could pass a lie detector test. Among the statements with which defendant was barraged was the following:

> We can't promise you anything, Bob, but we can promise you, if you're honest with us, we can do everything we possibl[y] can to help you out. We can't promise you anything.

It is difficult to see how a juvenile with an IQ of 81 could fully appreciate the emptiness of such remarks.

[¶ 10.] The State charged defendant with Count I, kidnapping under SDCL 22–19–1(2), a class 1 felony; Count IA, aggravated kidnapping under SDCL 22–19–1(2), a class A felony; Count II, first-degree murder under SDCL 22–16–4, a class A

felony; and Count IIA, first-degree felony murder under SDCL 22–16–4, a class A felony. At trial, the jury found defendant guilty of Counts IA and IIA. The trial court imposed a sentence of life imprisonment for each conviction.

## B.

### Custodial Interrogation Without Parental Notice

[¶ 11.] On defendant's motion to suppress the statements he gave to the officers, the trial court conducted a hearing and later entered its findings of fact and conclusions of law. We quote from pertinent selections of those findings:

*Findings of Fact*

III. Robert Horse, DOB: 04/18/1984, traveled to the DCI office at the request of law enforcement officers. His adult [half-] brother Jerry Horse, Jr., with whom Robert was living, was also present at the DCI office in Rapid City. Robert's parents were living in the Pine Ridge area and did not have a telephone. Agent West asked for, and received, permission from Jerry Horse to speak to Robert, in Robert's presence.

IV. In the first conversation, between approximately 8:00 p.m. on June 17, 1999, and approximately 12:30 a.m. on June 18, 1999, Agent Pat West and Investigator David Bramblee questioned Robert. West advised Robert of his *Miranda* rights, including the advisement that what Robert said could be used against him in adult court, and twice received an indication from Robert that he understood those rights and wished to waive them. Although Robert described prior involvement and, in his opin-

ion, mistreatment by, law enforcement, this is the first time Robert had ever been advised of *Miranda.*

XIII. [Robert] lied to the officers at least twenty-eight (28) times during this conversation [details omitted].

XIV. Neither investigator made any promises to Horse regarding the final outcome of his conversations. In fact, West pointed out that he wasn't going to tell Robert that everything was "peachy keen."

XV. When Robert became emotional about the crime, West encouraged Robert to tell the truth, and pointed out that things would be better from that point on. Robert wondered [whether] West really could (make things better), and West committed to working with him "all the way."

XVI. When Robert wanted [to make a deal], West emphasized that he could make no promises, but that he would "go to bat" for Robert, if necessary.

XVII. The first conversation took place in the polygraph room of the DCI office in Rapid City for privacy purposes only. There was no discussion or pretense to hook up a polygraph while Robert was in the room.

XVIII. The investigators' second conversation with [Robert] lasted from about 1:00 a.m. to approximately 3:00 a.m. on June 18, 1999. While on the way to the crime scene, Investigator David Bramblee confirmed that Horse recalled the *Miranda* warning while in the car on the way to the scene, and reminded [Robert] that they still applied.

Robert did not verbally answer Bramblee, but nodded his head affirmatively.

XX. ... West pointed out that he didn't think Robert would pass a polygraph [test], yet Robert indicated he would be willing to take one, to prove that he was telling the truth to the investigators.

XXIV. When Robert questioned the officers about what would happen to him if he was holding back, Bramblee reiterated that they could not make him any promises, but that holding back would not generally be good for Robert.

XXV. In the early morning hours of Friday, June 18, 1999, Agent West arrested Robert Horse for his participation in the murder of Morning Star Standing Bear. West took Horse to JSC in Rapid City.

XXVI. West next contacted [Robert] for the third, and final, conversation with [Robert] at approximately 8:30 a.m. on Saturday, June 19, 1999, at JSC. West reminded [Robert] of the *Miranda* warnings, including the juvenile admonition, prior to beginning the interview. The purpose of the interview was to clarify what each of the co-defendants, including Robert, had done. West did not have contact with Jerry Horse or Robert's parents prior to this conversation.

XXXI. [At one point, Agent West left this interview with Robert to contact his supervisor, Agent Overturf.] Upon returning to finish speaking with Robert, Agent West confirmed that

Horse had not been contacted by anyone since being incarcerated at JSC.

XXXIII.  Agent West concluded the interview with Robert [ ] at 10:10 a.m. At approximately 10:20 a.m., West was paged by Agent Overturf. West promptly returned the call, and Overturf told West to cease the interview because Horse was now represented by counsel. . . .

XXXIV.  At no time during any of West's contacts with Robert [ ] did Robert invoke his right to remain silent or to speak to an attorney.

XXXV.  Dr. Stephen Manlove and his associate, Dewey Ertz, observed Robert Horse's IQ to be at the overall level of 81, in the low average range. [Robert's] performance IQ was 84, and his verbal IQ was 80, all within the low-average range. . . .

*Conclusions of Law*

■ III.  The first interview was noncustodial in nature. Defendant came voluntarily to headquarters via private vehicle, at the request of law enforcement. Defendant was not handcuffed or otherwise restrained. Defendant was properly and completely advised of his *Miranda* rights, including the fact that any statements could be used against him in adult court.

IV.  Agent West spoke with Defendant's [half-] brother Jerry Horse, who indicated that Defendant's parents did not have a phone. Jerry Horse, as purported guardian of Defendant Robert Horse, gave his approval for the interview of Defendant. Defendant's detention was not violative of SDCL 26–7A–15.

V.  Although Defendant was in the low average range of intelligence, he understood his rights and knowingly and voluntarily waived his rights under *Miranda.*

VI.  The second interview was noncustodial in nature and occurred in Agent West's vehicle at the crime scene and during the trip to and from the crime scene. Defendant was reminded of his *Miranda* rights and nodded his head in understanding. Defendant understood his rights and knowingly and voluntarily waived his *Miranda* rights.

VII.  The third interview occurred at the Juvenile Services Center in Rapid City and was a custodial interrogation. Defendant was again advised of his *Miranda* rights and knowingly and voluntarily waived his *Miranda* rights. The third interview was concluded before Agent West learned that Defendant had been assigned counsel.

VIII.  All of Defendant's statements were voluntary beyond a reasonable doubt.

IX.  At no time did Defendant invoke his right to remain silent and at no time did he request the assistance of counsel.

X.  Defendant's statements were the result of legitimate police interrogation techniques and were not the result of coercion, intimidation, or threats of physical harm.

XI.  Defendant's Motion to Suppress Statements is denied.

A ruling on a motion to suppress based on an alleged violation of a constitutionally

protected right is a question of law reviewed *de novo*. *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488.

[¶ 12.] Children can be "easy victim[s] of the law," so we take special care to scrutinize the record when juveniles are involved. *Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 303–04, 92 L.Ed. 224, 228 (1948). *Miranda* warnings safeguard the privilege against self-incrimination during "incommunicado interrogation of individuals in a police-dominated atmosphere." *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966). Such an atmosphere creates compelling pressures undermining the will to resist, compelling suspects to speak where they would not otherwise do so voluntarily. *Id.* at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. *Miranda* must be enforced strictly in those situations where the concerns that generated the decision are implicated. *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317, 333 (1984). These concerns are only heightened when juveniles are interrogated.

> The youth of an accused is a significant factor in determining the voluntariness of a confession. A juvenile's constitutional right against self-incrimination should be afforded additional protection. If counsel is not present when an admission is obtained, a court must take great care to assure that the juvenile's confession was voluntary "in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair."

*State v. Caffrey*, 332 N.W.2d 269, 272 (S.D. 1983) (quoting *Application of Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967)) (internal citations omitted). As an additional safeguard against self-incrimination, we held in *State v. Lohnes*, "that before a trial court can conclude that a juvenile has made a clear and intelligent waiver of his rights to counsel and against self-incrimination, the State must establish that the juvenile was advised of the possibility that he may be tried as an adult." 324 N.W.2d 409, 414 (S.D.1982) (*overruling on other grounds recognized by State v. Woods*, 374 N.W.2d 92, 96 (S.D.1985)). Furthermore, the United States Supreme Court noted in *Gallegos v. Colorado*, that in juvenile matters courts deal with "a person who is not equal to the police in knowledge and understanding of the consequence of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." 370 U.S. 49, 54, 82 S.Ct. 1209, 1212–13, 8 L.Ed.2d 325, 328 (1962). Nonetheless, the Supreme Court has never required as a *per se* rule the presence of a parent or guardian, and it made clear in *Fare v. Michael C.*, that juvenile waivers of Fifth Amendment rights should be judged by the "totality of the circumstances." 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979).

[¶ 13.] A totality-of-circumstances analysis applies in deciding whether a juvenile's consent to interrogation was freely and voluntarily given. We consider "the juvenile's age, experience, education, background, intelligence, and capacity to understand the warnings, ... the nature of Fifth Amendment rights, and the consequences of waiving such rights." *Caffrey*, 332 N.W.2d at 272. As was the case in *Caffrey*, the record "does not indicate that the defendant had had extensive contacts with law enforcement officers, probation officers, and the courts that marked the juvenile in *Fare v. Michael C.*" *Id.* Again, as in *Caffrey*, we also consider the juvenile's level of immaturity and inexperience together with the gravity of misrepresen-

tations used by the interrogating officers. *Id.* (citing *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)).

[¶ 14.] Threats that the child can be sent to prison in order to elicit his cooperation certainly are a factor in gauging voluntariness. The interrogating officers admitted they threatened defendant to overcome his free will:

Q.: (Defense counsel) Okay. You threatened Robert Horse with the fact that he was going to go to prison, didn't you?

A.: (Officer) Yes.

Q.: Okay. And what was the purpose of that threat?

A.: To elicit his cooperation.

Q.: To get him to talk?

\* \* \*

A.: Yes.

Q.: And it was to overcome his free will because he'd been silent up to that point about it. Isn't that true?

A.: Correct.

Q.: And what is the purpose of saying to somebody "You're going to get charged with accessory to murder" if they don't talk?

A.: To elicit their cooperation, get them to talk.

Q.: To overcome their free will to remain—to not talk up to that point. Right?

A.: Yes.

[¶ 15.] Furthermore, defendant was given illusory assurances, the officers themselves seeming to assume a parental manner toward this fifteen-year-old.

Officer: You know, it's just one of those things that I know it's bad. I know it's bad. But you're—but holding out

here, you're making it worse for yourself. Don't do that. You're too God—damned young. I don't want to see that.

Defendant: I know.

Officer: I'm not bullshitting you here, Bob. You know what I'm saying? I've got nephews your age. Do you think I would want them to be in your position? Do you know what I would tell them if they were in your position? I would say, "tell the police everything and get the hell out of it," you know? Your situation—I don't want to see you take the blame and take the hit for something you didn't do, Bob.

You're 15 years old. I can relate to you. I hang out with my nephews all the time. We hunt and we fish, and we do all kinds of different stuff, you know? and I would not want that on them. You—you need to come forward, Bob. I know things are tough.

Officer: Throw that away.

Officer: I know things are tough. But I want you to move forward and explain to me, you know, what you think. Tell me what you're thinking about. What [are] your concerns?

Defendant: My dad, man.[1]

Officer: OK. You're worried about your dad?

Defendant: Yeah.

Officer: What he's going to think, you mean?

And I understand that. I've got a great relationship with my dad, too. And I'm still—I'm 33 years old, and I'm still concerned about what he thinks, you know, because his opinion means a lot to me. But I can guaran-

---

**1.** It is also noteworthy that the officers learned that defendant had an ongoing rela-tionship with his father.

tee you, Bob, that your dad would rather have somebody come forward and take responsibility and try to make things right.

What's done is done. But now it's time to come forward and make things right, Bob.

\* \* \* \* \* \*

Officer: Let it go, man.

Officer: It's all right to let it go. It's not—we can make things better from this point on, you know.

Defendant: Are you sure you could?

Officer: I'm going to be with you all the way. You know, like I told you, this is going to be a rough road, but we can—we can work through it.

Bob, look at me. It's going to be all right. Hey, let's talk about it and see what's going on. OK?

That's why I'm here. That's why I'm spending time with you. That's why Dave is here. We want to know what is going on. We want to know what happened. I know it's hard. I know it's really hard, but once you start talking about it and get it off your chest, it's going to be better. You don't need to live with this stuff.

Bobby, hey, it's all right.]

[¶ 16.] At one point, the officers even suggested that defendant's father would want him to confess.

Officer: Hey, look at me. What are you thinking about in there, big guy? What are you thinking about?

Defendant: About my dad.

Officer: I know.

Officer: What about your dad? Tell us about your dad.

Officer: I know you're concerned about what he thinks about you. Parents are important. You respect your parents; you're concerned about them.

Officer: What would your dad want you to do? Would not he want you to be a stand-up guy?

Officer: I know my dad taught taking responsibility for what you do, stepping up to the plate.

Officer: If you mistake, you admit it.

Officer: If you make a mistake, step back, brush yourself off, and get back on again.

Defendant: Yeah, man, I've got all these dreams, man, going to the Army. Shit, it ain't going to happen.

Officer: Well, that's not necessarily true, Bob.

Defendant: It's true.

Officer: Not necessarily. . . .

We view such tactics differently in the context of an adult interrogation; but for a fifteen-year-old whose parents were not notified of his status, a child who had no opportunity to consult with a parent, guardian, or custodian, this type of interrogation becomes questionable.

[¶ 17.] A crucial statutory safeguard to assure the due process rights of juveniles taken into custody is the requirement that a parent, guardian, or custodian be "immediately" notified.[2] Accordingly, SDCL 26–7A–15 provides in pertinent part:

The officer or party who takes a child into temporary custody . . . shall immediately, without unnecessary delay in keeping with the circumstances, inform the child's parents, guardian or custodi-

---

**2.** *See People v. Montanez,* 273 Ill.App.3d 844, 210 Ill.Dec. 295, 652 N.E.2d 1271, 1275 (1995) (purpose of "notice" requirement in juvenile statutes requiring law enforcement officer who takes minor into custody to notify parent that minor has been taken into custody is *"to allow, where possible,"* parent to confer and counsel with juvenile before interrogation and confession)(emphasis added).

an of the temporary custody and of the right to a prompt hearing by the court to determine whether temporary custody should be continued. If the child's parents, guardian, or custodian cannot be located after reasonable inquiry, the officer or party taking temporary custody of the child shall report that fact and the circumstances to the state's attorney.

We note that immediate notification is mandatory. The word "shall" in our statutes "manifests a mandatory directive," conferring no discretion. SDCL 2–14–2.1.

[¶ 18.] Many courts have suppressed juvenile confessions given in custodial interrogations where law enforcement officers violated parental notification statutes. *M.M. v. State*, 827 P.2d 1117 (Wyo.1992) (noting that law enforcement officials must comply with parental notification statute for juveniles' statements to be admissible); *M.A.C. v. Harrison County Family Court*, 566 So.2d 472, 473 (Miss.1990) (blatant violation of juvenile's statutory right to have parent present during interrogation required exclusion of any statements made); A *Minor Boy v. State*, 91 Nev. 456, 537 P.2d 477, 480 (1975) (mandates of notification statute satisfied where "all reasonable efforts" were made by police to contact defendant's mother and not more than one hour could have elapsed before she contacted and there was "no evidence of any intentional delay in contacting" defendant's mother); *In re Williams*, 265 S.C. 295, 217 S.E.2d 719, 721 (S.C.1975) (statements admissible in absence of showing that parents were not notified in accordance with statute); *Barrow v. State*, 749 A.2d 1230 (Del.Supr.2000) (suppressing statements by juvenile because parental notification statute violated); *In re D.B.*, 303 Ill.App.3d 412, 237 Ill.Dec. 3, 708 N.E.2d 806, 812 (1999) (purpose of law requiring immediate notification of parents when juvenile taken into custody "is to permit, where possible, a parent to confer with and counsel the juvenile before interrogation and confession"; "statute does not condition the requirement of calling a juvenile's parent on whether the juvenile wants his parent called"); *Palmer v. State*, 626 A.2d 1358 (Del.Supr.1993) (reversing seventeen-year-old juvenile's conviction because police's failure timely to notify custodian violated mandate of statute and constituted deprivation of defendant's right to due process and self-incrimination rights); *People v. Brown*, 182 Ill.App.3d 1046, 131 Ill.Dec. 534, 538 N.E.2d 909, 911 (1989) (flagrant violation of statute requiring officers to make reasonable attempts to notify parents among factors causing court to determine that defendant's statement was involuntary and therefore should be suppressed); *Sublette v. State*, 365 So.2d 775, 777 (Fla.Dist.Ct.App.1978) (failure to comply with statute requiring that parents be immediately notified upon arrest of child renders any statements made by juvenile inadmissible); *Cf. People v. Gardner*, 257 A.D.2d 675, 683 N.Y.S.2d 351 (1999) (admitting child's confession, since parental notification requirement satisfied).

[¶ 19.] For the notice statute to apply, the juvenile must be in custody. The trial court found that the first two interrogations were noncustodial. The United States Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *See Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. In the absence of an actual arrest, custodial interrogation means that something is said or done by the law enforcement authorities, either in their manner, their tone, or their questions, that indicates they would not have allowed the suspect to depart. *United States v. Hall*,

421 F.2d 540, 545 (2ndCir.1969). Under SDCL 26–7A–15, the question is not whether children might perceive themselves to be in custody, but whether the police have in fact taken them into custody. The record unquestionably shows that defendant was in custody.[3] That he would perceive himself to be deprived of his freedom of action for *Miranda* purposes is also certain. He was taken handcuffed to and from the crime scene. It was clearly erroneous to have found otherwise. The trial court did find that the third interrogation session, undertaken in the JSC, occurred while defendant was in custody.

[¶ 20.] In none of the three interrogation sessions did the officers comply with either the letter or the spirit of the notification statute. The interrogators learned from Jerry that defendant's parents lived on the Pine Ridge Indian Reservation and had no telephone. On the one hand, the State makes clear in its brief that it does not consider Jerry to be either a legal guardian or custodian, but, on the other hand, the record makes clear that the interrogators considered Jerry to be a guardian for the purpose of obtaining consent to question defendant. Even if a brother can be considered a guardian of sorts, his consent may be meaningless if he has a conflict of interest with the child or has no real parental relationship with the child. *See Matter of Steven William T.,* 201 W.Va. 654, 499 S.E.2d 876 (1997) (relative who was also suspect had conflict of interest). The record indicates that, although defendant's most recent residence was Jerry's home, he spent little time with Jerry and much with Chaske and Dawn. In addition, defendant and Jerry were more than a decade apart in age and had never had a close relationship before defendant came to Rapid City.

[¶ 21.] After obtaining Jerry's "permission" to question defendant, the interrogators made no attempt to contact defendant's parents or his aunt.[4] The State

---

**3.** One of the interrogating officers testified that from the very start, defendant was not going to be allowed to leave.

Q. So is it fair to say that from the second that you started talking to Robert Horse in that interview room, that he was detained and he was not going to be free to walk out of there?

A. That's correct, yes.

Q. But he was not under arrest; he was just detained?

A. That's correct, yes.

Q. So he was in temporary law enforcement custody.

A. I guess, yes.

**4.** No consultation occurred or was permitted between defendant and his brother about the brother's consent or about defendant's decision to waive his rights and submit to interrogation.

Q: And now prior to [the first] interview [with defendant], as I understand it, had you spoken to Jerry Horse?

A: Prior to the interview with Robert? Yes.

Q. Yes.

A. Yes.

Q. Okay, And had you interviewed him on tape?

A. Jerry, yes.

Q. Okay. Now, when you asked for information about the parents and things like that, is that when you were out in the entryway of the DCI office?

A. I believe so, but I believe he was also asked during Jerry's interview.

Q. Okay. Did you interview Jerry, then, before you spoke to him out in the foyer of the DCI office?

A. Did I—

Q. Did you interview Jerry in a room, separate and apart and before from when you talked to him about talking to [defendant] out in the foyer of the DCI office?

A. I don't believe so.

Q. Who interviewed Jerry Horse?

A. Myself and Investigator Bramblee.

Q. Was that before you interviewed [defendant]?

A. That's correct.

Q. And was that before you spoke with Jerry about whether or not he would consent to [defendant] being interviewed?

maintains, "That was all they were able to do." However, the Pine Ridge Indian Reservation has a police force that can be contacted by telephone and could have been requested to locate defendant's parents. No doubt, other means of attempting to contact them were available as well. Indian children taken into police custody are entitled to no less protection under the law simply because their parents, guardians, or custodians reside on reservations.[5] Since defendant at the time of the interrogations was under law enforcement control and presented no danger to himself or others, it was unreasonable under the circumstances for the interrogators to make no attempt to contact his parents. *Cf. Steven William T.*, 499 S.E.2d 876 (delay in contacting parents was for primary purpose of obtaining a confession). Police officers must use their best efforts to locate a parent, guardian, or custodian when a child is taken into custody. *Cf. M.A.C.*, 566 So.2d at 474 (juvenile's confession suppressed because mother prevented from being present during questioning). Indeed, "[t]he enlargement of discretionary

police power in derogation of statutory rights entails the danger of inconsistent law enforcement and the resultant evils of disrespect and distrust of legal institutions." *[Alfred Doe] v. State*, 89 Nev. 564, 517 P.2d 183, 184 (1973) (concluding that failure to notify mother or uncle for between 3 and 12 hours was not justified).

▇▇▇ [¶ 22.] To come at the question from the other side, we observe that notice to and the presence of parents, guardians, or custodians during interrogation can, in a close case, tip the balance toward finding a juvenile's statements to be given freely and voluntarily. *United States v. Harris*, 453 F.2d 1317, 1322 (8th Cir.1972). The absence of a defendant's parents, guardian, or custodian from the interrogation sessions because of a failure to comply with the notice requirement tends to weigh against voluntariness, i.e., against the possibility that defendant's statements were in fact "product[s] of the suspect's own balancing of competing considerations." *State v. Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d 311, 320. It is precisely

---

A. I believe—I am not positive, but I think we asked him during the interview; but we did ask him for sure—I know I asked him for sure between his interview and between [defendant's] interview in the lobby.

Q. Okay. Now, was it at the interview that was taped or the conversation out in the lobby where you learned that Robert's parents were down in Pine Ridge?

A. You know, I don't know for sure. I just know it was stated.

Q. When you spoke with Jerry Horse out in the foyer about speaking with Robert Horse, tell me what you said and tell me what Jerry Horse said, please.

A. I believe I asked Jerry if it was okay if we talked with Robert about where he was, what's been going on the last couple of days with him. And what I recall is Jerry specifically stated, "Go ahead. He will talk to you," or "He will tell you what you want to know," or something to that effect.

**5.** The dissent contends that trying to notify a parent or guardian under these circumstances "presents a practical nightmare for law enforcement." In truth, we will never know what they might have accomplished because the officers here did nothing. They made no effort to contact defendant's parents or his aunt, either directly or through tribal authorities.

Q. Were you present when Jerry Horse had given permission for law enforcement to speak to Robert Horse?

A. No, I was not.

Q. And did you make any efforts or have any contact with anyone identifying themselves as Robert's parents that night?

A. No, I did not.

Q. And did you make any effort to contact anyone else besides Jerry Horse regarding Robert?

A. No. He (i.e., Jerry) had told us that his parents didn't have a telephone; that we would not be able to contact them.

because most children lack the maturity, perspective, and judgment to weigh the sometimes devastating consequences of waiving their constitutional rights that parental or adult guidance is encouraged. Under the totality of the circumstances standard, every court to examine the issue has suppressed the confession of a child whose parent or guardian was deliberately excluded from consulting with the child. *See, e.g., State v. Presha*, 163 N.J. 304, 748 A.2d 1108, 1119 (2000) (citations omitted) (Stein, J., concurring).

[¶ 23.] Then, too, the time of day and the length of the interrogation are part of the totality of the circumstances. *In re D.B.*, 237 Ill.Dec. 3, 708 N.E.2d at 812. In *Haley v. Ohio*, the United States Supreme Court wrote:

> Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years [age 15] is a match for the police in such a contest.

332 U.S. 596, 599–600, 68 S.Ct. 302, 304, 92 L.Ed. 224, 228 (1948). Defendant was subjected to two sessions of questioning during the night, one from 8:00 p.m. to 12:00 a.m., and another from 1:00 a.m. to 3:00 a.m., and a third session a few hours later.

[¶ 24.] The trial court found that defendant's statements were the result of legitimate police interrogation techniques. However, the threats, the offer of a "lifeline," and the impenetrable language regarding what would or would not be promised to defendant, all impugn a finding of voluntariness, particularly with the interrogation taking place in the absence of any notice to defendant's parents and an opportunity for him to consult with them or his aunt. Furthermore, during the interrogation, when defendant asked to talk to his half-brother, whom the officers had earlier treated as a guardian for consent purposes, the officers refused to allow defendant to confer with him.

[¶ 25.] Under the totality of the circumstances here, including the seriousness of the offense for which defendant was being interrogated; his age of fifteen; his low IQ; his background and educational level; his relatively insignificant previous dealings with the police or the courts; the nature and tone of the questioning used; the length of time and the lateness of the hours of interrogation; and the fact that defendant was held in custody and incommunicado, not able to consult with a parent, guardian, or custodian, or even his brother whom the officers treated as a *de facto* guardian, we determine that despite his having been given *Miranda* warnings, his statements were involuntary.

[¶ 26.] In the future, we will continue to examine challenged juvenile interrogations on a case-by-case basis. The totality of circumstances approach "refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation." *Fare*, 442 U.S. at 725–26, 99 S.Ct. at 2571–72, 61 L.Ed.2d at 213. Thus, while we do not hold that a juvenile has a *per se* right to consult with a parent, guardian, or custodian before questioning or to have such persons present during questioning, we do hold that notice to a parent, guardian, or custodian and a child's opportunity to confer with such persons are significant factors in evaluating the voluntariness of a statement or confession under the totality of the circumstances. *See People v. Brown*, 182 Ill.App.3d 1046, 131 Ill.Dec. 534, 538 N.E.2d 909, 913 (1989). These

opportunities were wholly foreclosed by the interrogating officers in this case.[6]

■ [¶ 27.] Furthermore, we cannot say that noncompliance with the notice requirement was harmless. Failure to comply with the parental notification statute prevents detained children from receiving assistance and advice from those persons they would normally look to for guidance. Notifying these persons must be taken to have a purpose: to bring the child in contact with a mature adult family member or caretaker. Here, the officers not only failed to notify defendant's parents or his aunt, but also refused defendant's request even to confer with his adult half-brother. As in all criminal cases, the State bears the burden of proving beyond a reasonable doubt the voluntariness of a defendant's statements.

*State v. Morato*, 2000 SD 149, ¶ 12, 619 N.W.2d 655, 659. Under all the circumstances, such proof is lacking here. We conclude, therefore, that the circuit court erred in admitting defendant's statements at trial.

■ [¶ 28.] Defendant's statements were also admitted in his transfer hearing. "[A] transfer hearing is a 'critically important' action determining vitally important statutory rights of the juvenile." In the *Interest of A.D.R.*, 499 N.W.2d 906, 907 (S.D.1993). In the circuit court's findings of fact and conclusions of law, there is no disclaimer that defendant's statements played no role in the court's decision to transfer defendant's case to adult court. Since we have held those statements to be inadmissible as evidence, we remand for rehearing on the transfer issue, with the

---

**6.** Once the officers obtained consent to interrogate from defendant's brother, the brother's participation as a "guardian" was terminated:

Q. Now, at any point, did you notify Jerry Horse that Robert was in temporary custody and he had a right to a prompt hearing by the Court to determine whether temporary custody should be continued?

\* \* \*

A. No.

Q. Did you, at any point, inform Jerry Horse, that is, the guardian, that he had a right to sit with Robert Horse as he was being questioned?

A. I don't believe that I stated that to him, no.

Q. Okay. In fact, during that first interview, Robert Horse asked to talk to his brother Jerry, whom you viewed as his guardian, didn't he?

A. Yeah. Partway through, he did, yes, sir.

Q. And you didn't let him talk to his guardian when he asked, did you?

A. I informed him that he could talk with his brother, and we took a break, and then we came back in and the conversation never did come back up.

Q. Was there ever any point where you told him he could not talk to his brother?

A. I believe just prior to that, I stated, "No, we're not going to let you talk to him."

And then I came back in about two minutes later and said, "We'll let you talk to him," and then it never came back up after that.

Q. So, I mean, you don't deny the fact that you didn't let him talk to Jerry when he first asked?

A. At first, I stated, "No." Correct.

Q. Okay. Now, you're trained, are you not, that before you can speak with a juvenile, you have to get parental consent?

A. We try to make an effort to do that, yes.

Q. Okay. Did you ever make any effort to get a hold of Robert's parents?

A. No, I did not.

Q. Have you ever had an occasion to interview a juvenile with a parent present?

A. Yes, I have.

Q. Why would you let a parent remain present when you were interviewing a juvenile?

A. If the parent insisted that they wanted to be present for the interview, otherwise, I was not going to be able to talk to the juvenile or whatever, then we would allow that. Normally, we do not like to have the parents in with the juvenile during the interview.

Q. But it's your understanding that the parent or the guardian has a right to be present at the time of the interview, if they choose?

A. Yes. As far as I'm aware of, yes.

proviso that defendant's statements cannot be considered. *See Illinois v. Robinson,* 301 Ill.App.3d 634, 235 Ill.Dec. 395, 704 N.E.2d 968, 973–74 (1998).

## C.

### Conclusion

[¶ 29.] Defendant's statements used against him in both the transfer hearing and the trial are inadmissible. A hearing on the question whether he should be transferred to adult court must be conducted without use of his illegally obtained admissions. Whether the court decides that defendant should be tried in adult or juvenile court, defendant's statements to law enforcement cannot be introduced as evidence. In view of our decision on the statements, we need not reach the other questions raised on appeal.

[¶ 30.] Reversed and remanded.

[¶ 31.] SABERS and AMUNDSON, Justices, and GORS, Acting Justice, concur.

[¶ 32.] GILBERTSON, Chief Justice, dissents.

[¶ 33.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

GILBERTSON, Chief Justice (dissenting).

[¶ 34.] I respectfully dissent. I would hold that, as no more than a factor to be considered in the totality of the circumstances, the lack of notification of parents, guardians or custodians in this case does not tip the balance in favor of suppressing Robert's statements. Nor would I hold that it creates a bright line rule that law enforcement must overcome to gain admission of a juvenile's statement, which was otherwise voluntary.

[¶ 35.] At one point, this Court apparently concludes that SDCL 26–7A–15 [7] does not impose a per se rule of inadmissibility in the absence of parental notification. Yet, in later declaring "immediate notification is mandatory," it also appears to contradict itself and draw a bright line rule from a procedural statute that provides none. Neither the statute, nor our constitutional standard for determining voluntariness, is compatible with such a rule. *See Fare,* 442 U.S. at 725, 99 S.Ct. at 2572, 61 L.Ed.2d at 212; *Gallegos,* 370

---

7. SDCL 26–7A–15 provides:

The officer or party who takes a child into temporary custody, with or without a court order, except under a court order issued during a noticed hearing after an action has been commenced, shall immediately, without unnecessary delay *in keeping with the circumstances,* inform the child's parents, guardian, or custodian of the temporary custody and of the right to a prompt hearing by the court to determine whether temporary custody should be continued. If the child's parents, guardian, or custodian cannot be located after reasonable inquiry, the officer or party taking temporary custody of the child shall report that fact and the circumstances immediately to the state's attorney. The state's attorney shall notify the child's parents, guardian, or custodian, without unnecessary delay, of the time, date, and place of the temporary custody hearing. The hearing shall be held within forty-eight hours if it concerns any apparent abused or neglected child or within twenty-four hours if it concerns any apparent delinquent child pursuant to § 26–8C–3 or any apparent child in need of supervision pursuant to § 26–8B–3, excluding Saturdays, Sundays, and court holidays, after taking the child into temporary custody, unless extended by order of the court. Failure to notify the child's parents, guardian, or custodian of the temporary custody hearing is not cause for delay of the hearing if the child is represented by an attorney at the hearing. (emphasis added).

U.S. at 55, 82 S.Ct. at 1213, 8 L.Ed.2d at 328.[8]

[¶ 36.] The Legislature required that notification of parents, guardians or custodians be made "without unnecessary delay *in keeping with the circumstances.*" SDCL 26–7A–15 (emphasis added). In doing so, it recognized that there are circumstances that may render it unnecessary or even impossible for a juvenile's parents, guardians or custodians to be notified before questioning begins. *See, e.g., Theriault v. State,* 66 Wis.2d 33, 223 N.W.2d 850 (1974) (holding failure to notify parents in accordance with statute did not affect voluntariness as juvenile asked police not to contact semi-invalid grandmother because it might adversely affect her health); *State v. Paille,* 601 So.2d 1321 (Fla.Dist.Ct.App.1992) (holding defendant's confession was voluntary, notwithstanding age and mother's absence, because juvenile had requested parent not be notified); *Grogg v. Com.,* 6 Va.App. 598, 371 S.E.2d 549 (1988) (holding absence of parent weighed less heavily against voluntariness because mother did not have a telephone, father could not be reached and no adult family member was available). Even if law enforcement had contacted the Pennington County State's Attorney, who in turn contacted the Pine Ridge police, who in turn searched out the mother's or aunt's residence, there is no factual basis to conclude that they could have been found at all, or if so, when.[9]

[¶ 37.] Moreover, we determine a statement's voluntariness, including that of a juvenile, under a "totality of the circumstances" standard, which is consistent with the literal wording of SDCL 26–7A–15. The statements of a juvenile are not rendered inadmissible because they were given before notification of the parents, guardians or custodians. *See Doerr v. State,* 383 So.2d 905, 907 (Fla.1980); *People v. Zepeda,* 47 Ill.2d 23, 265 N.E.2d 647, 649 (1970); *Commonwealth v. Wallace,* 346 Mass. 9, 190 N.E.2d 224, 229 (1963). While at one point, this Court correctly acknowledges that lack of notice is merely a *factor* to be considered in the totality of the circumstances, it does not convincingly demonstrate that the absence of Robert's parents somehow dominates totality analysis in this case.

[¶ 38.] Here, law enforcement got permission to question Robert from Jerry Horse, the half-brother with whom Robert was living. This discussion took place, and permission was obtained, in Robert's presence. Before the interview, Robert was advised of his Miranda rights, and that what he said could be used against him in adult court. During one interview, Robert

---

8. Today, this Court declares that "[a] crucial statutory safeguard to assure the due process rights of juveniles taken into custody is the requirement that the juvenile's parents guardian or custodian be 'immediately notified.'" Beyond its misinterpretation of the explicit language of SDCL 26–7A–15, the only authority cited by the Court for this new due process constitutional mandate is an intermediate court of appeals case from Illinois, *People v. Montanez,* 273 Ill.App.3d 844, 210 Ill.Dec. 295, 652 N.E.2d 1271, 1272 (1995). *Montanez,* however, actually supports the thesis of this dissent, as it advances parental notification only "where possible." *Id.*

9. The family history relayed by Robert in his psychiatric evaluation by Doctor Stephen Manlove indicated that Robert was raised primarily by his father until the age of twelve, when Robert moved from Sacramento, CA, to Porcupine, SD, and began living with his aunt. But Robert would only "occasionally see his mother on the street and at her workplace," and there is no indication of whether his father is still in Sacramento or now lives here in South Dakota. Robert has a seventeen-year old sister living with another aunt in Montana and several half siblings, some living on their own and some living with his mother.

was so oriented towards the subject matter that he corrected the officers no less than sixteen times regarding their inaccurate summary of information. A subsequent mental health professional examination of Robert determined him to be within the low average range of intelligence. He received primarily Bs and Cs, with the occasional D, in school. His teachers characterized him as a "quiet" and "nice young man" who "can do better if he tries." Robert attributed his lower grades (he received all As and Bs before moving to South Dakota) to missing too many school days while spending time with his girlfriend. In addition, the trial court entered the following relevant findings of fact:

> [Robert] spoke English, appeared to understand West's questions, and answered West's questions in an appropriate fashion. West did not believe there was any ethnic barrier to their communication. [Robert] was cocky, arrogant, stand-offish, and seemingly unconcerned about discussing the murder.

Robert was not deprived of food, drink, or sleep. He gave every indication that he understood and willingly participated in the conversational exchange. Thus, by allowing the lack of notification to outweigh the multitude of other factors favoring voluntariness, this Court's decision essentially establishes a bright line rule in which notification of parents, guardians or custodians is determinative in every juvenile case.

[¶ 39.] Furthermore, this Court's decision presents a practical nightmare for law enforcement. Unfortunately, the grizzly facts of this case are not unique to this State.[10] This case involves a 15–year–old juvenile who has not been cared for by either of his parents in at least three years. In fact, there is evidence in the record that suggests Robert's mother has had very little role in his life since his birth. Immediately prior to the murder, Robert had been living with his half-brother, who acted as his custodian in reality if not legality, for the past month.[11] Before that, Robert lived with his aunt on the Pine Ridge Indian Reservation, not either of his parents. Robert's half-brother informed police that Robert's "parents didn't have a telephone; that we wouldn't be able to contact them." While this fact alone would have made contact difficult, the added jurisdictional problems associated with Indian country, as well as the uncertainty of whether one parent resides in another state, made location and notification of

10. In *State v. Lohnes*, 324 N.W.2d 409 (S.D. 1982), a 16–year–old boy was convicted of second degree murder, burglary and grand theft when he shot and killed a motel owner with a high powered rifle at point blank range. When police attempted unsuccessfully to locate his parents, Lohnes' mother was living "somewhere in Minnesota and his father had been killed in Viet Nam." *Id.* at 418. *See also In re S.K.*, 1999 SD 7, 587 N.W.2d 740 (involving 16–year–old convicted of first degree robbery and escape); *In re Y.C.*, 1998 SD 76, 581 N.W.2d 483 (involving 16–year–old who committed first degree robbery of bank with loaded .357 magnum and declared, once released, he would get even with bank teller); *State v. Jensen*, 1998 SD 52, 579 N.W.2d 613 (involving 14–year–old convicted of first degree murder for executing an unarmed cab driver by shooting him in the head at point blank range); *State v. Rios*, 499 N.W.2d 906 (S.D.1993) (16–year–old convicted of second degree manslaughter and aggravated assault with a knife).

11. This Court dismisses the permission granted by Jerry Horse concluding that "he has a conflict of interest with the child or has no real parental relationship with the child." Robert, himself, sees his relationship with his brother Jerry in a vastly different light. In his brief, Robert argues that law enforcement's refusal to allow him to confer with his brother, rather than being meaningless, is so significant that it rises to a violation of the Fifth Amendment privilege against self-incrimination. Robert cannot have it both ways.

Robert's parents, guardians or custodians (other than Jerry) nearly impossible.

[¶ 40.] South Dakota law enforcement has no legal authority in its official capacity to enter Indian country to seek out Robert's mother or aunt. *State v. Lufkins,* 381 N.W.2d 263, 266 (S.D.1986). The aunt, and possibly the mother, were residents of the Pine Ridge Indian Reservation and members of the Oglala Sioux Tribe. "It is common ground here that Indian conduct occurring on the trust allotments is beyond the State's jurisdiction...." *DeCoteau v. Dist. County Court,* 420 U.S. 425, 428, 95 S.Ct. 1082, 1085, 43 L.Ed.2d 300, 305 (1975).[12] The jurisdiction of the State law enforcement ends at this state's borders. Its officers have no more authority to seek out Robert's mother or aunt on the Pine Ridge Reservation than they do to seek out his father in Sacramento, California.

[¶ 41.] In cases like this one, not only would the police be required to find and notify parents, guardians or custodians, but prior thereto they would also be required to act as fact finding judicial entities to determine who is legally responsible for the child. The alternative would be to risk notifying the wrong individuals and thus render all statements by the juvenile involuntary.

The case at hand did not involve the traditional "Leave It To Beaver" family where mom, dad and the kids all ate supper together under the same roof each evening. In this case, the biological father was not living with his biological son. Importantly, the traditional "Cleaver" family is becoming less and less common in contemporary society.

*Meldrum v. Novotny,* 2002 SD 15, ¶ 66, 640 N.W.2d 460, 473 (Amundson, J., concurring).

[¶ 42.] Robert argues that either parents or guardians (but not custodians) must be successfully notified or no interview with the juvenile is constitutionally acceptable. This Court's decision today appears to conclude at one point that this bright line "either/or" rule is not correct, but nevertheless unconvincingly attempts to rescue Robert's legal position by advancing a third option even he did not advance. With no foundation in the record, this Court declares that "the Pine Ridge Indian Reservation has a police force that can be contacted by telephone and could have been requested to locate defendant's parents." Even if this new thesis is correct, it does not translate into successful timely notification of either of the child's parents or his aunt. Specula-

---

**12.** Claims of legality for previous forays into Indian country by state law enforcement have not been well received by the courts in this State. *See U.S. v. Anderson,* 857 F.Supp. 52 (D.S.D.1994) (holding state parole officers lack authority to conduct on-reservation warrantless search of tribal member's home); *Annis v. Dewey County Bank,* 335 F.Supp. 133 (D.S.D.1971) (holding service of process invalid on tribal members in Indian country); *State v. Spotted Horse,* 462 N.W.2d 463 (S.D. 1990) (holding no hot pursuit of Indian into Indian country for crime committed in State jurisdiction); *Lufkins,* 381 N.W.2d 263 (holding no state authority for law enforcement to serve a subpoena on tribal members in Indian country).

This Court's declaration that recognition of tribal sovereignty, which has been upheld in an unbroken line of cases dating back to *Worcester v. Georgia,* somehow denies Native American children equal protection under SDCL 26–7A–15, is without legal support. *See* 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832). To the contrary, the Supreme Court has specifically recognized that in state-tribal jurisdictional relationships, Native Americans may possess jurisdictional rights to access state courts while the corresponding right of the state to exert its jurisdiction in Indian country is denied. *Three Affiliated Tribes v. Wold Eng'g,* 476 U.S. 877, 893, 106 S.Ct. 2305, 2314, 90 L.Ed.2d 881, 895 (1986).

tion that the Pine Ridge police might have been able to locate any of them is nothing more than that just speculation. The only other option raised by this Court (and again never raised by Robert) is that: "[n]o doubt, other means of attempting to contact them were available as well." These "other means," however, were never identified by the State, Robert, the trial court, or this Court. The trial court made no findings to factually support the nebulous theories that this Court now advances. Before setting aside this conviction on an evidentiary record such as this, we would be well advised to specify the exact nature of the realistic and reasonable legal [13] options the officers supposedly had, but never exercised, particularly when these unexercised options mandate a reversal.

[¶ 43.] SDCL 26–7A–15 is a procedural statute providing only for parental notification that the child is in custody and that a dispositional hearing will be held. Contrary to this Court's assertion, the statute does not give a child the right to confer with a parent, guardian or custodian before questioning. It does not give a child the right to be accompanied by a parent, guardian or custodian during questioning. It does not require a parent, guardian or custodian to give permission before the child is questioned.[14] Indeed, the statute specifically states that "failure to notify the child's parents . . . is *not* cause for delay of the hearing." SDCL 26–7A–5 (emphasis added). Therefore, it is illogical to import legislative intent to delay questioning absent notification. In doing so, this Court imposes a burden of impossible performance, holding that until parents, guardians or custodians are notified, even those that are unavailable, absent, or outside the jurisdiction of the State of South Dakota, almost any questioning of a juvenile would be illegal.

[¶ 44.] The more dysfunctional the family, the more likely that parental, guardian or custodian notification will advance from the difficult to the impossible. *Lohnes,* 324 N.W.2d at 418. The officers are faced with the difficult task of identifying these parties and then the even more difficult task of effectuating their timely notification. *Id.* Thus, under this Court's ruling, the more likely it is that law enforcement will be helpless to solve crimes committed by juvenile members of dysfunctional families. I am not persuaded by this Court's opinion that such was the intent of the Legislature when it enacted SDCL 26–7A–15.[15]

**13.** No claim is advanced that there existed a cross-deputization agreement between the State and this tribe. *See generally* 25 USC 2804(a).

**14.** Notwithstanding the conflict of this Court's interpretation with the literal language of SDCL 26–7A–15, one might ask exactly how the appearance of Robert's parents or aunt would have affected the outcome of these interrogations. *See Brookins v. State,* 704 So.2d 576, 578 (Fla.Dist.Ct.App.1997) (holding 16–year–old murder suspect's statements admissible, despite failure to contact parents, as there was "nothing in the record to suggest that [mother's] absence affected the voluntariness of the defendant's statement."). Robert had been fully Mirandized and advised that any statements he made could be used against him in adult court. *See In re Watson,* 47 Ohio St.3d 86, 548 N.E.2d 210 (1989) (stating no requirement in *Miranda* that parents be read child's constitutional rights along with him to effectuate valid waiver). He repeatedly had to correct the police on their inaccurate summaries of what he had told them. Neither Robert nor this Court advance any convincing claim as to what might have been different had the parents been notified, let alone if they had actually appeared at the interrogation.

**15.** Although unintentional, this Court inadvertently identifies the result which it mandates in this case when it says, "[t]he record indicates that although defendant's most recent residence was Jerry's home, he spent little time with Jerry and much with Chaske and

Society must be protected from violent crime and the agony of its effects. It is of little or no comfort to a victim of violent crime and the victim's family that the victim's life was damaged or destroyed by a youth rather than an adult. Protection of society must be sought whether accomplished through rehabilitation or incarceration.

*In re Y.C.*, 1998 SD 76 at ¶ 43, 581 N.W.2d at 490.

[¶ 45.] I would affirm this conviction and accordingly, I respectfully dissent.

Dawn." As has been previously set forth, Robert's father, mother and aunt were at unknown locations outside the jurisdiction of the State of South Dakota. The Court declares Jerry to be unacceptable for the purpose of custodian notification in compliance with SDCL 26–7A–15 because Robert had spent little time with Jerry. Presumably, this would leave law enforcement with the dubious alternative of notifying Chaske White, Robert's gang leader and the instigator of Morning Star's murder.